UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


ELIZABETH WILLIAMS, INDIVIDUALLY,
AND AS CLASS REPRESENTATIVE OF
ALL SIMILARLY SITUATED PERSONS                              PLAINTIFFS


VS.                              CIVIL ACTION NO. 3:13CV38TSL-JMR


RICHARD "RICKEY" BERRY, IN HIS OFFICIAL
CAPACITY, AND MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES                                DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the motion of defendant

Richard "Rickey" Berry, in his official capacity, and the

Mississippi Department of Human Services, to dismiss for lack of

subject matter jurisdiction and for failure to state a claim,

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of

Civil Procedure.  Plaintiff Elizabeth Williams has responded to

the motion and the court, having considered the memoranda of

authorities submitted by the parties, concludes that the motion

should be granted.

Plaintiff Elizabeth Williams, individually and purporting to

act on behalf of all other similarly situated individuals who rely

on government-provided certificates to pay for child care, has

brought the present action under 42 U.S.C. § 1983 challenging the

constitutionality of the Mississippi eChildcare program, a

technology-based fingerscanning method used to issue payments to

child care providers and track child care attendance for individuals who participate in the Mississippi Child Care Payment Program.

The Mississippi Child Care Payment Program (Program) is a federally-funded program designed to provide assistance with child care tuition to low-income parents who meet prescribed income and work requirements. Parents who are eligible for participation in the program may choose any type of child care, licensed or unlicensed, while participating in the program. For those who meet the guidelines, the program pays a part of the tuition cost, i.e., a subsidy payment, and the participant pays a portion, i.e., the family co-pay. Both payments go directly to the child care provider. According to the complaint, Williams has been a recipient of childcare assistance since 2009.

Defendant Mississippi Department of Human Services (MDHS) adopted a new rule implementing the eChildcare program, which is set to go into effect October 1, 2013. At present, attendance of children in enrolled families is tracked via sign-in/sign-out sheets maintained at the child care facilities. The eChildcare program replaces the sign-in/sign-out sheets with electronic fingerscanning.[1] The eChildcare program requires that licensed

---

[1] Finger scan biometrics is based upon the unique characteristics of the human fingerprint. Finger scan technology uses a device similar to a scanner at a grocery store checkout counter to capture the image of

2

child care facilities and their enrolled families utilize Point of Service (POS) machines where a parent or household designee will be fingerscanned upon dropping off or picking up the child as a way of documenting the child's attendance at the child care facility on a daily basis. For unlicensed providers, the POS system involves the use of a land-line telephone system by a parent or household designee to document attendance at the child care facility on a daily basis. Unlicensed providers and their enrolled families will utilize a telephone-based Interactive Voice Response system to track child attendance.

Each family participating in the eChildcare program is permitted up to five household designees that may drop off and pick up children at the day care provider. Parents are responsible for identifying up to four household designees that will be allowed to check the child(ren) in and out of care daily.

---

> the fingerprint. The identifying features of the fingerprint are extracted, and a template is created which stores data about the fingerprints' pattern....
>
> Unlike traditional fingerprinting, which stores the full image of the fingerprint for use in large-scale, one-to-many searches on databases, finger scan acquires the full image of the fingerprint for use in the creation of the template, but does not store the full image. After the data is extracted, the fingerprint is not stored and the image of the fingerprint cannot be recreated from the template.

Fishman and McKenna, Wiretapping and Eavesdropping, § 31:6 (Supp. 2012).

Parents will enter the legal names of their selected household designees by logging into the Child Care Payment Program website upon completion of mandatory training. Parents and household designees must present themselves to be fingerprinted, and then must be fingerscanned each time the child is dropped off or picked up from the provider. Parents are ultimately responsible for ensuring that child attendance is recorded at the child care provider site.

According to the complaint, plaintiff Elizabeth Williams is a 23-year old single mother of two children who currently attends Mississippi State University. Williams applied for and was awarded a child care certificate beginning in September 2009 for her then one-year-old son to attend a child care center while she pursues her college degree and works to get off of government assistance. Williams alleges that she is unable to drop off and/or pick up her son from the child care center, and her mother, on whom she has thus far relied to drop off and pick up her son from the child care center, is unwilling to voluntarily undergo fingerprinting and repeated fingerscanning. Williams contends that since under MDHS policy, she must comply with all MDHS policies in order to remain eligible to receive the childcare certificate, she is thus at risk of losing her child care certificate. She alleges that the eChildcare program

(1) constitutes an unreasonable search and seizure under the
Fourth Amendment; (2) violates her reasonable expectation of
privacy in her status as a recipient of government assistance; (3)
interferes with her fundamental right to direct the care of her
child; (4) violates her rights to equal protection under the
Fourteenth Amendment; (5) violates her rights to due process under
the Fourteenth Amendment; and (6) violates the Supremacy Clause
under Art. VI, cl. 2 of the United States Constitution.  Williams
seeks declaratory and injunctive relief against defendants'
enforcement of the fingerprinting and fingerscanning requirement.
Defendants seek dismissal of each of plaintiff's claims pursuant
to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure for one or more of a number of reasons, which will be
addressed herein.

Eleventh Amendment Immunity

Williams has named as defendants Mississippi Department of
Human Services (MDHS) and Richard Berry, in his official capacity
as Director of MDHS.  Defendants initially seek dismissal of the
complaint in its entirety pursuant to Rule 12(b)(6) on the basis
that the MDHS and Director Berry, in his official capacity, are
not "persons" that can be sued under 42 U.S.C. § 1983, and on the
basis that Director Berry and MDHS are immune from liability under
the Eleventh Amendment of the United States Constitution.
Defendants are only partially correct.  The claim against MDHS is

due to be dismissed, as MDHS, an arm of the State, is not a "person" under § 1983, and has immunity under the Eleventh Amendment.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) (holding that a state agency is not a person for purposes of § 1983); Stewart v. Jackson County, Miss., Civil Action No. 1:07cv1270WJG-JMR, 2008 WL 4724009, 2 (S.D. Miss. Oct. 25, 2008) (finding that MDHS is an arm of the State entitled to Eleventh Amendment immunity).  However,

> [u]nder the principles established in Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), "the Eleventh Amendment does not bar a suit in federal court against a state official to enjoin his enforcement of a state law alleged to be unconstitutional."  American Bank and Trust Co. v. Dent, 982 F.2d 917, 920 (5th Cir. 1993).  Moreover, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"  American Bank, 982 F.2d at 921 (quoting Will, 491 U.S. at 71 n.10).

Horton v. Mississippi State Senate, No. 95-60307, 1995 WL 81642, 1 (5th Cir. Aug. 30, 1995).  See Will, 491 U.S. at 71 n. 10, 109 S. Ct. 2304, 2312 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' ") (internal citations and quotations omitted); See Bryant v. Starr, Civil Action No. H-11-4483, 2013 WL 1855891, 1 (S.D. Tex. Apr. 30, 2013) ("Thus, while declaratory and prospective

injunctive relief cannot be pursued against the State in federal court, it can be pursued against a state official sued in his official capacity.").[2]

Standing

Defendants next argue that Williams lacks prudential standing to maintain suit in federal court. "[S]tanding jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction[.]'" Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004). "Constitutional standing requires that the plaintiff personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts." Doe v. Tangipahoa Parish School Bd., 494 F.3d 494, 496-497 (5th Cir. 2007). See Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 560 (5th Cir. 2001) (to satisfy constitutional standing requirement, a plaintiff must show (1) an injury in fact

---

[2]    As Williams has sued Berry in his official capacity for declaratory and injunctive relief only, so that it is clear her claims fall under the Ex Parte Young exception, the court will disregard Williams' concession in her response to the motion that "she cannot proceed against Director Berry in his official capacity and thus, that claim should now be dismissed." The court will deny her related request that she be allowed to amend to name Berry in his individual capacity since she has suggested no arguable basis for an individual-capacity claim against Berry.

7

(2) that is fairly traceable to the actions of the defendant and

(3) that likely will be redressed by a favorable decision).

Defendants do not challenge Williams' constitutional standing and

have no basis for doing so.[3]  With respect to each of her claims,

Williams alleges that she faces the prospect of termination of her

child care certificate, i.e., an injury, caused by the eChildcare

program administered by defendants, which would be redressed by a

favorable decision in the case.

"Prudential standing requirements exist in addition to 'the

immutable requirements of Article III,' as an integral part of

'judicial self-government,' [t]he goal of [which] is to determine

whether the plaintiff 'is a proper party to invoke judicial

resolution of the dispute and the exercise of the court's remedial

powers.'"  Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 560

(5th Cir. 2001) (internal citations omitted).  Prudential standing

requirements are:

> [j]udicially created limits [that] concern whether a
> plaintiff's grievance arguably falls within the zone of
> interests protected by the statutory provision invoked
> in the suit, whether the complaint raises abstract
> questions or a generalized grievance more properly
> addressed by the legislative branch, and whether the
> plaintiff is asserting his or her own legal rights and

---

[3]      See Environmental Conservation Organization v. City of
Dallas, 529 F.3d 519, 525 (5th Cir. 2008) (stating that "before
considering any other matters raised by the parties, we are
obliged to resolve the standing question as a threshold matter of
jurisdiction") (internal quotation and citation omitted).

interests rather than the legal rights and interests of third parties.

Logan v. Burgers Ozark Country Cured Hams Inc., 263 F.3d 447, 460 (5th Cir. 2001) (quoting Proctor & Gamble, 232 F.3d at 560).  See also Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc., 702 F.3d 794, 801 (5th Cir. 2012) ("prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights'") (quoting Elk Grove, 542 U.S. at 12); Ward v. Santa Fe Indep. School Dist., 393 F.3d 599, 606 (5th Cir. 2004) (prudential limitations on standing include requirement that "a litigant must assert his or her own legal rights and interests and cannot rest a claim to relief on the legal rights or interest of third parties.").

Defendants' argument with respect to prudential standing is that Williams' alleged injury, i.e., the risk of losing her child care certificate, is based not on her own refusal to be fingerprinted and fingerscanned but rather on her mother's unwillingness to provide her fingerprints and be subjected to fingerscanning.[4]  "Unlike a dismissal for lack of constitutional

---

[4]     Williams must have standing as to each claim alleged. See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press.").  Defendants' challenge to standing goes only to Williams' claim for violation of her putative Fourth Amendment right to be free from an unreasonable search.  Defendants do not contend that she lacks standing to pursue her claim for violation of her Fourteenth Amendment right to informational privacy or her

standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)." Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795 n.2 (5th Cir. 2011) (citing Blanchard 1986, Ltd. v. Park Plantation, LLC, 553 F.3d 405, 409 (5th Cir. 2008)). Defendants note that in her complaint, Williams alleges that to date, she has relied on her mother to drop off and pick up her son from the day care center since Williams has been attending college at Mississippi State University and thus unable herself to drop off or pick up her son. Williams alleges that she is at risk of losing her child care certificate because "[her] mother is unwilling to voluntarily undergo fingerprinting and repeated finger scanning." Defendants argue that based on these allegations, Williams' complaint must be read as asserting not her own, but rather her mother's alleged Fourth Amendment rights. In the court's opinion, however, the complaint may fairly be read to challenge Williams' own alleged right not to be fingerprinted and fingerscanned absent probable cause. The complaint does allege that *to date*, Williams has relied on her mother to drop off and pick up the child from the day care center because Williams has been unable to do this herself. However, Williams also alleges

---

claim based on alleged violation of her right to equal protection or due process.

that she is at risk of having her child care certificate revoked "if she does not undergo fingerprinting and agree to undergo repeated fingerscanning when she drops off or picks up her child from the licensed child care center he attends", and that "[s]ubjecting the Plaintiff to repeated finger scanning is an unreasonable search and seizure in the absence of probable cause." While she has had to rely on her mother to date, the allegations of the complaint cover the potential that Williams may herself be in the position of dropping off or picking up the child.  The court is satisfied that Williams has standing to pursue this claim.

Fourth Amendment

Williams maintains that the fingerprinting and fingerscanning required by the eChildcare program invade her privacy and thereby violate her Fourth Amendment protection against unreasonable searches.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The threshold issue presented as to this claim is whether fingerprinting or fingerscanning constitutes a search within the meaning of the Fourth Amendment.

A person's Fourth Amendment rights turn upon her reasonable expectation of privacy.  To prove a violation of the Fourth Amendment, the person must show that she had a subjective

expectation of privacy in the object of the challenged search and that her expectation is one that society would view as reasonable. <u>California v. Ciraolo</u>, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1987) (citing <u>Katz</u>, 389 U.S. at 360 (Harlan, J., concurring)). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." <u>United States v. Jacobsen</u>, 466 U.S. 109, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984) (footnote omitted). The applicability of the Fourth Amendment thus depends on "whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." <u>Smith v. Maryland</u>, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (citations omitted). The question, then, is whether Williams has an expectation of privacy in her fingerprints.

"Although it is well established that the taking of fingerprints is permissible incident to a lawful arrest, courts have rarely addressed the question of whether the act of fingerprinting is itself a search." LaFave, William, 1 <u>Search & Seizure</u> § 2.6(a) (5th ed. Supp. 2012). As Justice Scalia recently observed, the Supreme Court's cases provide no ready answer to question whether taking a person's fingerprints is a Fourth Amendment search, <u>Maryland v. King</u>, – U.S. –, 133 S. Ct. 1958, 1987 (2013) (Scalia, J., dissenting); and the Fifth Circuit has

not decided the issue.  However, a number of courts have interpreted Supreme Court authority ass indicating that fingerprinting is not a search within the meaning of the Fourth Amendment.

In <u>Katz v. United States</u>, the Supreme Court declared that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).  In subsequent cases, the Court has alluded to fingerprints as falling within the category of physical characteristics that are exposed to the public.

In <u>Davis v. Mississippi</u>, the Court ruled that admission at trial of fingerprints obtained from the petitioner was error, since the fingerprints were obtained as the result of an illegal detention.  394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969). Although the Court held that the fingerprints were inadmissible fruits of the illegal detention, the Court observed that "[f]ingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."  <u>Id.</u> at 727, 89 S. Ct. at 1398.  In <u>Davis</u>, "it was the initial seizure-the lawless dragnet detention-that violated the Fourth and Fourteenth Amendments, not the taking of the

fingerprints." <u>U.S. v. Dionisio</u>, 410 U.S. 1, 11, 93 S. Ct. 764, 770 (1973). The Court "left open the question whether, consistently with the Fourth and Fourteenth Amendments, narrowly circumscribed procedures might be developed for obtaining fingerprints from people when there was no probable cause to arrest them." <u>Id.</u> (citing <u>Davis</u>, 394 U.S. at 728, 89 S. Ct. at 1398).

In contrast to the detention in <u>Davis</u>, the Supreme Court in <u>Dionisio</u>, after first concluding that a witness's compulsory appearance before the grand jury was not an unreasonable seizure under the Fourth Amendment, held that a grand jury's directive to a witness to provide a voice recording was not an infringement of his rights under the Fourth Amendment, 410 U.S. at 13, 93 S. Ct. at 771, reasoning that

> [t]he physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.

<u>Id</u>. at 14, 93 S. Ct. at 771-772. The Court in <u>Dionisio</u> likened the voice exemplar to "the fingerprinting in <u>Davis</u>, where, though the initial dragnet detentions were constitutionally impermissible, we noted that the fingerprinting itself 'involves none of the probing into an individual's private life and thoughts

that marks an interrogation or search.'" Id. at 15, 93 S. Ct. at

772 (quoting Davis, 394 U.S., at 727, 89 S. Ct., at 1398).  Cf.

U.S. v. Mara, 410 U.S. 19, 21-22, 93 S. Ct. 774, 776 (1973)

(ruling that "[h]andwriting, like speech, is repeatedly shown to

the public, and there is no more expectation of privacy in the

physical characteristics of a person's script than there is in the

tone of his voice.").  And in Cupp v. Murphy, 412 U.S. 291, 295,

93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973), the Court referred to

fingerprints as "mere 'physical characteristics ... constantly

exposed to the public." (quoting Dionosio, 410 U.S. at 14).[5]

On the basis of these decisions, courts have held in various

contexts that fingerprinting is not a search under the Fourth

Amendment.  See, e.g., U.S. v. Farias-Gonzalez, 556 F.3d 1181,

1188 (11th Cir. 2009) (stating that "[t]he police can obtain both

---

[5]     1 W. LaFave, Search & Seizure § 2.6(a) (5th ed. 2012),
suggests that the dictum in Dionisio drawing an analogy between
taking voice exemplars and taking fingerprints, thereby suggesting
that fingerprinting is no search, "might be considered suspect ...
[since] [t]he language quoted from Davis was not included therein
for the purpose of showing that fingerprinting is not a search but
rather for the purpose of showing that detention for such a
limited intrusion might 'comply with the Fourth Amendment even
though there is no probable cause in the traditional sense.'" Id.
However, the writer acknowledged that
        "the Court has more recently [in Cupp v. Murphy]
        referred to fingerprinting as nothing more than
        obtaining 'physical characteristics … constantly exposed
        to the public,' and [that] lower courts have upheld the
        fingerprinting of grand jury witnesses without a showing
        of probable cause.
Id.

photographs and fingerprints without conducting a search under the Fourth Amendment"); <u>U.S. v. Teter</u>, No. 06-4050-01-CR-C-SOW, 2008 WL 141671, 6 (W.D. Mo. Jan. 11, 2008) (holding that "pursuant to <u>Dionisio</u>, because Teter regularly exposes to the public his face, as well as his finger and palm prints and handwritings, these are not protected by the Fourth Amendment"); <u>Stehney v. Perry</u>, 907 F. Supp. 806, 823 (D.N.J. 1995) (holding that "the taking of a fingerprint is not a search even though it involves touching and pressing, and reveals physiological traits too minute to be considered exposed to public view in any meaningful sense"); <u>Rowe v. Burton</u>, 884 F. Supp. 1372, 1384 (D. Alaska 1994) (stating that "the Supreme Court has recognized that one does not have an objectively reasonable expectation of privacy in one's likeness or fingerprints under the Fourth Amendment"); <u>Johnson v. Massey</u>, No. 3:92 CV 178 (JAC), 1993 WL 372263, 5 (D. Conn. Sept. 17, 1993) (holding that inasmuch as the plaintiffs' fingerprints were "mere physical characteristics" that were "constantly exposed to the public," they were not subject to the protections of the Fourth Amendment); <u>State v. Chesney</u>, 166 Conn. 630, 353 A.2d 783, 788 (1974) (holding that "applying paraffin casts to the accused's hands [to test for gunpowder reside] did not violate the fourth ... amendment[ ] any more than fingerprinting"), <u>overruled on other grounds</u>, <u>State v. Stange</u>, 212 Conn. 612, 563 A.2d 681 (1989). This court likewise concludes that the fingerprinting/

fingerscanning required by the eChildcare program is not a search within the Fourth Amendment meaning of that term.[6]

Even if it were to assume that the fingerprinting/ fingerscanning is a search, the court nevertheless concludes that the search is not prohibited by the Fourth Amendment since it does not "descend to the level of unreasonableness." See Wyman v. James, 400 U.S. 309, 91 S. Ct. 381, 27 L. Ed. 2d 408 (1971). "'As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."'" Maryland v. King, 133 S. Ct. at 1969 ("To say that the Fourth Amendment applies here is the beginning point, not the end of the analysis, as the Fourth Amendment constrains, not against all intrusions as such, but against intrusions which are

---

[6]     Williams relies heavily on Lebron v. Secretary, Florida Department of Childcare and Families, -- F.3d --, 2013 WL 672321 (11th Cir. Feb. 26, 2013), in support of her position that the taking of her fingerprints and subjecting her to fingerscanning violates the Fourth Amendment's protection against unreasonable searches.  Her reliance is unfounded.  The court in Lebron held that a suspicionless drug testing requirement for a TANF application violated the Fourth Amendment.  Unlike fingerprinting/fingerscanning, "[i]t is undisputed and well-established that government-mandated drug-testing is a 'search' within the meaning of the Fourth Amendment."  Id. at 2. In contrast to fingerprinting/fingerscanning, "the obtaining of some physical characteristics is quite clearly is a search."  1 W. W. LaFave, Search and Seizure § 2.6(a).  See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616, 109 S. Ct. 1402, 1413, 103 L. Ed. 2d 639 (1989) (collection of breath, blood and urine constitute searches under Fourth Amendment) (citations omitted).

not justified in the circumstances, or which are made in an improper manner.") (internal quotations and citation omitted). Reasonableness is determined by examining the "totality of the circumstances," U.S. v. Batiste, 343 Fed. Appx. 962, 965, 2009 WL 2903662, 2 (5th Cir. 2009), and requires "balancing on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests," Samson v. California, 547 U.S. 843, 848, 126 S. Ct. 2193, 2197, 165 L. Ed. 2d 250 (2006) (internal quotations and citation omitted); Battiste, 2009 WL 2903662, at 2 (reasonableness under totality of circumstances requires that court balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'") (quoting Gates v. Texas Dep't of Protective and Regulatory Servs., 537 F.3d 404, 427 (5th Cir. 2008)); Wanger v. Bonner, 621 F.2d 675, 681 (5th Cir. 1980) (in determining reasonableness of a particular law enforcement practice, "court must weigh the public interest promoted by the practice against its intrusion upon the personal rights of the individual protected by the fourth amendment"). "Some of the factors that the court should consider are 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is

conducted.'" <u>Wagner</u>, 621 F.2d at 681 (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979)).

"The fact than an intrusion is negligible is of central relevance to determining reasonableness...." <u>Maryland v. King</u>, 133 S. Ct. at 1969. Again, courts, including the Supreme Court in <u>Davis</u>, have repeatedly recognized the minimal intrusiveness of the fingerprinting process. <u>See Davis</u>, 394 U.S. 721, 727-28, 89 S. Ct. 1394, 1397-98, 22 L. Ed. 2d 676 ("Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."); <u>Iacobucci v. City of Newport, Ky.</u>, 785 F.2d 1354, 1356 (6th Cir. 1986) (noting minimal nature of the intrusion involved in fingerprinting), <u>rev'd on other grounds</u>, 479 U.S. 92, 107 S. Ct. 383, 93 L. Ed. 2d 334 (1986); <u>Sheyko v. Saenz</u>, 112 Cal. App. 4th 675, 688, 5 Cal. Rptr. 3d 350, 361 (Cal. App. 2003) (fingerscanning requirement as part of government benefit eligibility did not violate Fourth Amendment); <u>Ford v. Curtin</u>, No. 1:12-cv-367, 2012 WL 2089847, 4 (W.D. Mich. June 8, 2012) (noting "the minimal intrusion associated with obtaining a fingerprint"). Although Williams points out that the eChildcare program at issue does not require merely obtaining a single fingerprint or set of fingerprints but rather repeated fingerscanning, which she contends is more intrusive, the court is not persuaded. Requiring Williams or her designee to place her finger on the scanner twice a day is no more intrusive than

19

requiring her or her designee to sign the child in or out, a routine requirement at child care facilities.[7] See Welfare Policy--Fraud Prevention--New York Requires Finger Imaging for Welfare Recipients, 109 Harv. L. Rev. 1168 (1996) ("Finger imaging involves no physical intrusion and very little of recipients' time."); Killerlane III, Finger Imaging: A 21st Century Solution to Welfare Fraud at Our Fingertips, 22 Fordham Urb. L.J. 1327 (Summer 1995)("When applying for public assistance, an applicant must provide routine personal information; finger imaging is no more stigmatizing or invasive than providing any of this other information.").

The principal ostensible purpose of the fingerprinting/ fingerscanning requirement, as set forth in the complaint, is to deter fraud by tracking the attendance of children as a means of ensuring that they are present at the child care centers at the times for which payment is sought for their attendance.  The Supreme Court recognized in Wyman v. James that the government has

---

[7]     Indeed, under the current policy, sign-in and sign-out sheets are used to track attendance, as provided by § 104.01 of the DHS Child Care Policy Manual:

> Providers are required to maintain a record of accurate attendance and absences on a sign-in/out sheets and on daily class rolls for each child in order to document attendance.  The sign-in/out sheets must show the child's first and last name, the full name of the parent/guardian or parent's authorized representative, the time the child signed in, and the time the child is signed out with the signature of the person signing the child out each day.

a legitimate interest in ensuring that public funds are used for their intended purpose. At issue in <u>Wyman</u> was whether a beneficiary of the Aid to Families with Dependent Children program could refuse a home visit by the caseworker without risking termination of benefits. Although the Court was of the opinion that the home visit was not a search within the meaning of the Fourth Amendment, the Court concluded that even if the home visit possessed some of the characteristics of a search, the home visit was not unreasonable and hence did not violate the Fourth Amendment. Among other reasons for this conclusion, the Court recognized that

> [t]he agency, with tax funds provided from federal as
> well as from state sources, is fulfilling a public
> trust. The State, working through its qualified welfare
> agency, has appropriate and paramount interest and
> concern in seeing and assuring that the intended and
> proper objects of that tax-produced assistance are the
> ones who benefit from the aid it dispenses. Surely it
> is not unreasonable, in the Fourth Amendment sense or in
> any other sense of that term, that the State have at its
> command a gentle means, of limited extent and of
> practical and considerate application, of achieving that
> assurance.
>
> One who dispenses private charity naturally has an
> interest in and expects to know how his charitable funds
> are utilized and put to work. The public, when it is
> the provider, rightly expects the same. It might well
> expect more, because of the trust aspect of public
> funds, and the recipient, as well as the caseworker, has
> not only an interest but an obligation.

<u>Id.</u> at 319, 91 S. Ct. at 387. Likewise, MDHS and the public has an interest in ensuring that the funds allocated to the Program

21

are used for their intended purpose.  Given the governmental
interest in the proper use of public funds, and the minimal
intrusion associated with fingerprinting and fingerscanning, the
court concludes that plaintiff has failed to state a cognizable
claim for violation of her Fourth Amendment right to be free from
unreasonable search and seizure.  Like the home visits in Wyman,
the fingerprinting/fingerscanning requirements of the eChildcare
program are "reasonable administrative tool[s] ... that serve a
valid and proper administrative purpose for the dispensation of
the [eChildcare] program; that ... are not an unwarranted invasion
of personal privacy; and that ... violate[] no right guaranteed by
the Fourth Amendment."  Wyman, 400 U.S. at 326, 91 S. Ct. at 390.

Fourteenth Amendment: Informational Privacy

Williams claims that the requirement of fingerscanning
violates her Fourteenth Amendment right to informational privacy,
and specifically, her right to keep private the fact that she is
the recipient of government child care assistance.  Williams
submits that since only recipients of such benefits and their
designees are subject to the fingerscanning requirement, then by
requiring that she or her designee be fingerscanned at the child
care center upon dropping off or picking up her son, she is being
forced to divulge to others who have no legitimate need to know
that she and her son are recipients of government benefits.

In _Whalen v. Roe_, 429 U.S. 589, 599, 97 S. Ct. 869, 51 L. Ed.
2d 64 (1977), the Supreme Court recognized that the Fourteenth
Amendment right to substantive due process protects an "individual
interest in avoiding disclosure of personal matters."  429 U.S.
589, 599, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977) ("The prohibition
against government dissemination of private information ... is
found in the 'Fourteenth Amendment's concept of personal
liberty.'"); _see also_ _Nixon v. Adm'r of Gen. Servs._, 433 U.S. 425,
457, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977) ("One element of
privacy has been characterized as 'the individual interest in
avoiding disclosure of personal matters....' ").  The Fifth
Circuit has defined this confidentiality interest as "'the right
to be free from the government disclosing private facts about its
citizens.'"  _Wyatt v. Fletcher_, -- F.3d --, 2013 WL 2371280, 5 (5th
Cir. May 31, 2013) (quoting _Ramie v. City of Hedwig Village, Tex._,
765 F.2d 490, 492 (5th Cir. 1985)).[8]

Courts have consistently recognized that "[t]he federal
constitution ... protects against public disclosure [of] only
highly personal matters representing the most intimate aspects of

---

[8]     In addition to the confidentiality branch of the right
to privacy, there is the autonomy branch, which involves the
"'interest in independence in making certain kinds of important
decisions[,]' such as those relating to marriage, procreation, and
education." _Zaffuto v. City of Hammond_, 308 F.3d 485, 489 (5th Cir.
2002) (citing  _Whalen v. Roe_, 429 U.S. 589, 599-600, 97 S. Ct.
869, 51 L. Ed. 2d 64 (1977)).

human affairs, thereby shielding from public scrutiny only that information which involves deeply rooted notions of fundamental personal interests derived from the Constitution." <u>Doe v. Luzerne Cty.</u>, 660 F.3d 169, 176 (3rd Cir. 2011) (internal quotation and citation omitted). <u>See also</u> <u>Wade v. Goodwin</u>, 843 F.2d 1150, 1153 (8th Cir. 1988) ("The constitutional right to privacy is generally limited to only the most intimate aspects of human affairs.") (cited in <u>Zaffuto</u>, 308 F.3d at 490); <u>Ramie</u>, 765 F.2d at 492 ("[T]he Constitution is violated only by invasions of privacy involving the most intimate aspects of human affairs."). Williams has cited no authority which holds that one's status as a recipient of government assistance falls into this category.

The Fifth Circuit recently noted the dearth of precedent defining the contours of the confidentiality interest protected by the constitution. <u>Wyatt</u>, 2013 WL 2371280, at 5. <u>See also</u> <u>Zaffuto v. City of Hammond</u>, 308 F.3d 485, 490 (5th Cir. 2002) (noting that "the contours of the confidentiality branch are murky") (quoting <u>Scheetz v. The Morning Call, Inc.</u>, 946 F.2d 202, 206 (3d Cir. 1991)). In <u>Wyatt</u>, the court observed that while the Supreme Court recognized a right to informational privacy in <u>Whalen</u> and <u>Nixon</u>, it has since "'said little else on the subject of an individual interest in avoiding disclosure of personal matters'." <u>Id</u>. (quoting <u>NASA v. Nelson</u>, --- U.S. ----, ----, 131 S. Ct. 746, 756, 178 L. Ed. 2d 667 (2011) (noting that "no other decision has

squarely addressed a constitutional right to informational privacy.")). And the Fifth Circuit "has never explicitly determined what types of disclosures are 'personal' enough to create a constitutional cause of action...." Zaffuto, 308 F.3d at 490; see also Wyatt, 2013 WL 2371280, at 5 (acknowledging "[t]here is *no* Fifth Circuit authority on what types of disclosures are personal enough to trigger the protection of the confidentiality branch") (quoting Zaffuto, 308 F.3d at 490) (emphasis in Wyatt). However, the court in Zaffuto did note that "other courts have clearly been limiting the scope of confidentiality branch actions." Zaffuto, 308 F.3d at 490.

The only authority cited by Williams in support of her privacy claim, Roberts v. Austin, 632 F.2d 1202 (5th Cir. 1980), is inapposite for a number of reasons. The court in Roberts considered only a regulatory claim and expressly declined to decide the constitutional claim. 632 F.2d at 1214. In Roberts, the court found that the disclosure by food stamp office personnel of information in applicants' files to state prosecutors who were investigating public assistance fraud violated the Food Stamp Act and regulations promulgated thereunder which explicitly limited disclosure of information obtained from applicant households to persons directly connected with the administration or enforcement of provisions of the Act. 632 F.2d at 12-08-1210. In its opinion, the court alluded to "the household's right to maintain

its privacy and dignity," id. at 1210, and observed that in light of the regulations which gave recipients express statutory protection from disclosure of confidential information, recipients possessed "a legitimate expectation that the information will be kept confidential, id. at 1214.  But the court held only that "the Act and accompanying regulations [gave] recipients *statutory* protection from disclosure of confidential information," id. at 1213-1214 (emphasis added).  Cf. Nunez v. Pachman, 578 F.3d 228, 231-232 (3d Cir. 2009) (observing that even if state laws gave plaintiff a reasonable expectation of privacy of information relating to criminal record, plaintiff still failed to state claim for violation of federal constitution, which protects against public disclosure only "highly personal matters" representing "the most intimate aspects of human affairs") (citations omitted).

Williams contends that, similar to the regulations at issue in Roberts, MDHS policies gave her an expectation of privacy in her status as a recipient of child care assistance.  She points, in particular, to DHS Child Care Policy Manual § 100.05, which prohibits MDHS employees and child care providers "from using or disclosing any information concerning a parent's use of services for any purpose not in conformity with federal and state requirements, except with the written consent of the parent or authorized representative."  Under the eChildcare program, fingerscanning is a state requirement.  Clearly, this provision,

which by negative implication permits disclosure of information for purposes that are "in conformity with federal and state requirements," is far different from the statute and regulations at issue in <u>Roberts</u>, which the court described as "[t]he careful limitation on information disclosure throughout the regulatory structure, the qualified language of 7 C.F.R. § 273.16(e)(2), and the absence of any reference to providing case files to prosecuting authorities anywhere else in the regulatory structure...." <u>Roberts</u>, 632 F.2d at 1211. And in the court's opinion, this provision in the MDHS policy manual does not create a legitimate expectation of privacy in the receipt of child care assistance.

Further, whereas <u>Roberts</u> involved an affirmative disclosure of information from food stamp applicants' files by government employees, the fingerscanning requirement does not involve *government* disclosure of information concerning recipients. Williams contends otherwise, reasoning that since only recipients of child care assistance are required to be fingerscanned, then by forcing her or her designee to submit to fingerscanning at the child care center, the government is forcing her to disclose the private fact that she is a recipient of government assistance and thereby doing indirectly what it is forbidden to do directly. The court is not persuaded. The fact that others may observe Williams or her designee being fingerscanned and deduce therefrom that she

is a recipient of government assistance does not constitute
*government* disclosure of personal information.  The court thus
concludes that Williams has failed to state a claim for violation
of her Fourteenth Amendment right to privacy.

<u>Unconstitutional Conditions</u>

Williams alleges that the policy of requiring fingerprinting
and fingerscanning as a condition of continued receipt of child
care assistance violates her fundamental right to direct the care
of her child.  The Supreme Court has recognized that parents have
a fundamental liberty interests "in the care, custody, and control
of their children."  <u>See</u> <u>Troxel v. Granville</u>, 530 U.S. 57, 65-66
120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion)
("[I]t cannot now be doubted that the Due Process Clause of the
Fourteenth Amendment protects the fundamental right of parents to
make decisions concerning the care, custody, and control of their
children.").  However, the Government has no obligation to
subsidize the exercise of that right.

> Although the liberty protected by the Due Process Clause
> affords protection against unwarranted government
> interference with freedom of choice in the context of
> certain personal decisions, it does not confer an
> entitlement to such funds as may be necessary to realize
> all the advantages of that freedom.  To hold otherwise
> would mark a drastic change in our understanding of the
> Constitution. ... Whether freedom of choice that is
> constitutionally protected warrants federal
> subsidization is a question for Congress to answer, not
> a matter of constitutional entitlement.

Harris v. McRae, 448 U.S. 297, 317-318, 100 S. Ct. 2671, 2688-2689, 65 L. Ed. 2d 784 (1980). See also Regan v. Taxation with Representation of Wash., 461 U.S. 540, 549, 2003, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983) (recognizing that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"); Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Com'n, 698 F.3d 239, 247 (5th Cir. 2012) (holding that the "government's decision not to subsidize the exercise of a constitutional right does not equate to a penalty on the right") (citing Rust v. Sullivan, 500 U.S. 173, 182, 111 S. Ct. 1759, 1767, 114 L. Ed. 2d 233 (1991)). As defendants note, Williams remains free to direct the care of her child, her fundamental right, but with respect to the receipt of government assistance, her claim "to receive welfare benefits on [her] own informational terms does not rise to the level of a constitutional guarantee." McElrath v. Califano, 615 F.2d 434, 441 (7th Cir. 1980). See also Lavine v. Milne, 424 U.S. 577, 585 n.9, 96 S. Ct. 1010, 1015 n.9, 47 L. Ed. 2d 249 (1976) (holding that "[w]elfare benefits are not a fundamental right, and neither the State nor Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support.") (citing Dandridge v. Williams, 397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970)).

Equal Protection

Williams alleges that defendants have violated her right to Equal Protection because they require her to undergo fingerscanning but do not require individuals in other welfare programs to undergo fingerscanning to access their benefits. She alleges that the motion to dismiss is not well taken as defendants have identified no rational basis for treating her differently than other welfare recipients. The Supreme Court has held,

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.

Dandridge v. Williams, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970) (internal quotation marks and citation omitted). See also Williams v. St. Clair, 610 F.2d 1244, 1249 (5th Cir. 1980) (holding that "a legislative classification scheme involving welfare funds will withstand an equal protection challenge if it does not make an invidious discrimination, is supported by a rational basis, and furthers a legitimate state interest") (citing Dandridge); McElrath v. Califano, 615 F.2d 434, 441 (7th Cir. 1980) (stating that "[s]tatutory classifications in the area of social welfare have been held to be consistent with the Equal Protection Clause if the classification is neither irrational nor invidious) (citing Dandridge).

As defendants note, the eChildcare program allows MDHS to track child attendance for children receiving subsidy funds from the Mississippi Childcare Payment Program and to make payments to providers based on the information entered into the eChildcare system. The state has a duty to ensure the integrity of these funds and thus to ensure that accurate information is entered into the system. There is nothing irrational or invidious about MDHS taking steps to ensure that the funds are disbursed accurately and appropriately.

Procedural Due Process

Plaintiff alleges that MDHS has violated her Fourteenth Amendment due process right "to receive notice and a pre-deprivation hearing where counsel can participate in the proceeding hearing before the defendants unilaterally terminate Plaintiff's child care certificate." In their motion, defendants submit that the procedure provided by the MDHS Childcare Payment Program Policy Manual comports with due process requirements,[9] but

_____

[9]    The manual provides at Section 106:
106.01 PARENTAL AND PROVIDER DISPUTES
(1) Any unresolved dispute concerning a question of fact under the Application/Agreement between DECCD and Parent or Provider shall be decided by the Director of the Division of Early Childhood Care and Development. In the review by the DECCD Director the Parent or Provider shall be afforded an opportunity to be heard and offer evidence in support of the questioned decision under review. This decision shall be reduced to writing and a copy thereof mailed or furnished to the Parent or Provider and shall be final and conclusive, unless,

31

they contend that Williams has no cognizable due process claim as she has neither suffered a termination of benefits nor is she threatened with a termination of benefits. Plaintiff may choose to decline to abide by one of the childcare certificate program guidelines, i.e., fingerscanning; but in the court's opinion, her decision to not participate in the program

within thirty (30) days from the date of the decision, the Parent or Provider mails or delivers to the Executive Director of the Mississippi Department of Human Services a written request for review. Pending final decision of the Executive Director or his/her designee, DECCD will proceed in accordance with the decision of the Director of the Division of Early Childhood Care and Development. In addition, listed below are the procedures to be used when an Administrative Hearing for a Child Care Dispute is desired:
A. A Parent or Provider may not request a hearing on behalf of another individual or to discuss decisions regarding another person.
B. If an Administrative Hearing is desired, a written request for the Hearing must be submitted to the Director of the Division of Early Childhood Care and Development. If requested, an Administrative Hearing will be held with the Director of the Division of Early Childhood Care and Development serving as the Hearing Officer.
C. The Hearing Officer will be a neutral observer who will conduct the Hearing. The Hearing Officer will listen to both sides and then make a decision based upon the evidence that is provided.
D. This is an informal proceeding that gives both parties their due process rights and a forum to provide evidence. This is not an adverse process. Questions are to be asked only for clarification. If a party has legal representation, the attorney is there only to give legal advice to his/her client and not for direct or cross examination.

cannot be equated with a termination of public assistance
benefits.  Her putative claim for relief based on a potential due
process violation thus fails as a matter of law.

Supremacy Clause

Williams last claims that the eChildcare program violates the
Supremacy Clause of the federal constitution "because [the]
fingerprinting and repeated fingerscanning rule results in an
otherwise eligible beneficiary being denied a child care
certificate and that is contrary to Congress's intent for states
to design programs which best suit the needs of children and their
parents as well as programs that provide uninterrupted child care
services."  "The Supremacy Clause provides that the laws of the
United States 'shall be the supreme Law of the Land; ... any Thing
in the Constitution or Laws of any State to the Contrary
notwithstanding.'"  Teltech Systems, Inc. v. Bryant, 702 F.3d 232,
235 (5th Cir. 2012) (quoting U.S. Const. art. VI, cl. 2).  "The
Supremacy Clause mandates displacement of state law when (1)
Congress intends expressly to do so; or (2) Congress intends
implicitly to do so through a pervasive federal regulatory scheme,
or the state law conflicts with the federal law or its purposes.
Id. (citing English v. Gen. Elec. Co., 496 U.S. 72, 78-79, 110 S.
Ct. 2270, 110 L. Ed. 2d 65 (1990)).  Defendants seek dismissal of
this claim as plaintiff has identified no federal law which
expressly preempts state law, no pervasive federal regulatory

scheme and no state law which conflicts with federal law or its purposes. That is, plaintiff has pointed to no evidence of a congressional purpose to prevent states from implementing reasonable processes for tracking attendance of children who receive government assistance. Accordingly, this claim fails.[10]

Conclusion

Based on all of the foregoing, the court concludes that MDHS is entitled to be dismissed as it is not a proper defendant; and the court further concludes that as to Director Berry in his official capacity, plaintiff has failed to state a claim upon which relief can be granted. Accordingly, it is ordered that defendants' motion to dismiss is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 19th day of July, 2013.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[10]    The court notes that plaintiff does not acknowledge defendants' argument or address this claim in her response.